UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                                 :
SECURITIES AND EXCHANGE COMMISSION,          :
                                                                 :
                              Plaintiff,                     :
                                                                 :
                      v.                                       :          Civil Action No.
                                                                 :
JEHU HAND and                                            :
ANTONIO KATZ,                                          : **JURY TRIAL DEMANDED**
                                                                 :
                                                                 :
                              Defendants.                :
_____:

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges the

following against defendants Jehu Hand ("Hand") and Antonio Katz ("Katz") (collectively,

"defendants"):

## SUMMARY

1.        Defendants engaged in a scheme to manipulate the stock price and trading of, and

to pump and dump, the publicly traded stock of Greenway Technology ("Greenway") in a

scheme that began as early as May 2008 when Greenway was incorporated, with promotional

campaigns and stock sales beginning by June 2012 and continuing through at least January 2013

("the Greenway scheme").  From the outset of the scheme, the defendants concealed their de

facto control of Greenway as a corporate entity and their de facto ownership and control of a

large percentage of Greenway's stock to evade SEC Rule 144 [17 C.F.R. 230.144], which limits

stock sales by control persons.  Next, the planned scheme involved artificially inflating the price

of Greenway stock by, among other things, a) issuing news releases and/or promotional materials

containing false, exaggerated or misleading information, b) generating mass emails containing

false, exaggerated or misleading information, and c) engaging in undisclosed coordinated trading

of the stock, all designed to generate the appearance of demand and to increase the price of the

stock (the "pump").   The final stage of the scheme was the sale of the stock at artificially high

prices to unsuspecting investors (the "dump"), during which the defendants sold their shares in

Greenway while concealing from the investing public that these were sales by de facto corporate

insiders who controlled the operations of the corporation and who owned or controlled the bulk

of the company's shares.

2.      Unknown to the defendants, meeting telephonically and discussing with them the

scheme to manipulate the stock price and trading of, and to pump and dump, the publicly traded

stock of Greenway was an individual located in Massachusetts who was cooperating with federal

law enforcement authorities (the "CI") as well as undercover agents of the Federal Bureau of

Investigation (the "FBI").

3.      The defendants worked and coordinated with at least three additional participants

in the Greenway scheme ("CS-1," "CS-2" and "CS-3"; collectively "the co-schemers").  The

defendants laid the groundwork for the scheme beginning as early as May 2008, when Hand

formed Greenway as a Nevada corporation.  Hand, Katz and the co-schemers further advanced

and accomplished the Greenway scheme by a) using one or more backdated debt assignments, or

convertible promissory notes, to justify the issuance of millions of unrestricted shares of

Greenway stock to entities and individuals under the control of the defendants and the co-

schemers; b) writing and sending false legal opinion letters to firms that did business with

Greenway to facilitate the issuance, depositing and, ultimately, sale of the Greenway stock

controlled by the defendants and the co-schemers; and c) secretly planning and orchestrating the

sale of Greenway stock to the public at artificially inflated prices and without proper registration statements in effect.

4.     Greenway is a Nevada corporation based in Las Vegas, Nevada.  In its most recent incarnation, Greenway purports to be a company focused on purchasing, renovating, and operating resorts catering to gay and lesbian clientele.  Prior to October 2012, the company purported to be in the business of developing and exploiting "green energy technologies," though it never produced any revenues from such activities.  Greenway's stock, which is not registered with the Commission, is quoted and could trade nationally on the over-the-counter ("OTC") securities markets under the symbol GWYT.

5.     Based on this conduct, the Commission seeks the following relief against the defendants:  (i) entry of permanent injunctions prohibiting the defendants from engaging in future violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; Section 17(a) of the Securities Act of 1933 ("Securities Act") , 15 U.S.C. § 77q(a); and, Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c);  (ii) an order requiring the defendants to disgorge their ill-gotten gains and pay pre-judgment interest; (iii) an order requiring the defendants to pay appropriate civil monetary penalties; and, (iv) an order barring the defendants from participating in any offering of penny stock, pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## AUTHORITY AND JURISDICTION

6.     The Commission brings this action pursuant to enforcement authority conferred by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)].

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, Section

22(a) of the Securities Act [15 U.S.C. §77v(a)], and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa].  The District of Massachusetts is proper venue for this action under 28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the defendants' acts and transactions in furtherance of violations of the Exchange Act and the Securities Act, including discussions about the Greenway scheme with the CI, sending email blasts and other communications, and the offering and sale of Greenway stock to unsuspecting investors, took place in the District of Massachusetts.

8.      The defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or of the mail, in connection with the acts, practices, and course of business alleged herein.

9.      The defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## **DEFENDANTS**

10.      Jehu Hand, 58, is believed to be a resident of Antigua.  He previously lived in Dana Point, California.  Hand is the sole shareholder of Hand & Hand P.C, a California-based law firm and is licensed to practice as an attorney in California.  Hand incorporated Greenway and throughout the Greenway scheme he held himself out, variously, as securities counsel and disclosure counsel for Greenway.

11.      Antonio Katz, 51, resides in Red Bank, New Jersey.  Katz is a stock promoter.

### THE SCHEME TO MANIPULATE THE PRICE AND TRADING OF AND TO PUMP AND DUMP GREENWAY STOCK

**A.     Hand Incorporates Greenway and Establishes it as a Shell Corporation Controlled by Him and His Associates**

12.     Greenway was incorporated in Nevada by Hand on May 1, 2008.  On May 16, 2008, Greenway merged with Greenway Energy, a public company formerly known as Targetviewz, Inc.  Following the merger, the resulting company (named Greenway), which Hand controlled, agreed to repay 10 convertible promissory notes of $2,500 each, which had purportedly been issued by Targetviewz, Inc. on June 29, 2006.  Because the notes were supposedly in default, the company agreed to change the conversion rate from $.25 per share to $.0025 per share.  Seven of the ten noteholders were entities associated with Hand, while the other three noteholders were individuals associated with Hand.

13.     By March 1, 2010, all ten of the noteholders had converted their notes into restricted stock of Greenway, giving them a collective total of approximately 9,689,439 restricted shares, or approximately half of the 20,265,802 shares of Greenway stock then outstanding.  The only other large block of stock, consisting of approximately 9,928,367 restricted shares, was held by an entity controlled by the then president of Greenway, who also had a financial relationship with Hand.

14.     In addition to the restricted stock held by the ten noteholders, Hand also controlled a promissory note that was secured by all of Greenway's outstanding preferred stock.  Specifically, on June 20, 2008, Greenway issued a secured promissory note for $230,000 and 100,000 shares of restricted stock to JK Advisers Hedge Fund LLC, of which Hand was the manager.  The note was due and payable by March 31, 2009 and was secured by all five million

shares of Greenway's Series A Preferred Stock, each share of which was convertible into 10 shares of common stock.

15.     For the period from its inception on May 1, 2008 through June 30, 2012, Greenway had and reported no revenues and its only facility was "nominal use of office space provided without cost" by an affiliate.  For virtually all of that time period Greenway only existed as a shell company, which is a company that can serve as a vehicle for business transactions by other related companies or entities without itself having any real assets or operations.  While Greenway initially purported to be in the business of developing and exploiting oil recycling technology, and made representations to that effect in various early public filings, it apparently abandoned this pursuit after less than a year, and spent the next three years doing very little, if anything.  After filing its first four reports with OTC Markets Group, Inc. ("OTC Markets"), the organization that oversees the OTC markets, for the periods between June 30, 2008 and June 20, 2009, Greenway stopped filing reports for three years.  When the company finally filed again, on July 18, 2012, it still had no revenues, no plant, and no land, and the number of its employees had dwindled from three full-time and three part-time employees at the height of its operations early on, to one part-time employee, its president.

**B.     Hand and Katz, and Their Co-Schemers, Plan and Coordinate a Scheme to Defraud Investors in Greenway Stock**

16.     Beginning in approximately June 2012, Hand, Katz and their co-schemers took initial steps to implement a scheme to defraud owners and purchasers of Greenway stock. Communicating primarily by email, Hand, Katz and their co-schemers discussed and memorialized steps to carry out the scheme.  First, Hand, Katz and their co-schemers agreed to create a new control block of 150 million restricted shares of Greenway stock and place it in escrow, which gave them the ability to create the illusion that someone other than them –

whoever had purported ownership and control of the 150 million share block – actually owned and controlled Greenway. Hand, Katz and their co-schemers further agreed that they would then convert debt to create 15 million purportedly "free trade" shares of Greenway stock and issue those shares to entities under their control, all the while concealing their control over the vast majority of the company's stock. By "free trade" shares, Hand, Katz and their co-schemers meant shares that they could successfully pass off as "unrestricted," thereby concealing that the shares were actually owned and controlled by persons who exercised de facto control over the company. Next, the group agreed to sell the 15 million purportedly "free trade" shares of Greenway stock after a fraudulent promotional campaign "pumped" the market price of the stock, disbursing the proceeds as follows:

- 65% to be paid to "Marketing," which meant the promotional campaign they planned to "pump" the market price of Greenway stock;

- $37,500 to be paid to what they referred to as the "A.S. Group," which was to be led and organized by CS-1; and,

- $75,000 to be paid to the "Jehu Group," which was to be led and organized by Hand.

Hand, Katz and their co-schemers further agreed that any remaining proceeds would be disbursed on a percentage basis as follows:

- 7% to be "allocated for reinvestment," which meant providing money to fund a bare minimum of business-type activities by Greenway;

- 9.33% to be paid to the "Jehu Group"

- 9.33% to be paid to the "Katz Group," which was to be led and organized by Katz, and included CS-2; and,

- 9.33% to be paid to the "A.S. Group."

17.    As an initial condition of the agreement, Hand, Katz and the co-schemers agreed to place a total of $37,500 in an escrow account to be used for "clean-up costs" for Greenway and to function as a deposit by the various parties.  The group understood and agreed that Greenway, the company they were planning to use as a vehicle for their scheme, was nothing more than a shell with no real business operations, going so far as to include in their agreement that "[t]he vehicle GWYT comes with a zero balance and no liabilities."  In fact, the "clean-up costs" they referred to totaled about $11,200 and consisted of the following estimated payments for amounts owed in arrears by Greenway:  $5,500 to Greenway's transfer agent, the firm that handled issuance and trading of Greenway stock, $4,200 to OTC Markets, and $1,500 to the State of Nevada.  Paying those "clean-up costs" was designed to enhance the illusion that Greenway was something that Hand, Katz and their co-schemers knew it was not – i.e., an actual, functioning company with millions of shares held by unaffiliated investors.  The group further agreed that if 15 million shares could not be deposited and cleared for sale within 30 days, the $37,500 deposit (minus any paid "clean-up costs") would be returned.

18.    In order to cement their control of Greenway, and to facilitate creation of the new control block of stock, Hand, Katz and their co-schemers arranged to depose Greenway's part-time president and replace him with someone the group knew and would be able to control.  Therefore, during late June and early July 2012, Hand, Katz and their co-schemers used their de facto control of the company to replace Greenway's existing president, who was its sole officer and director, with an individual hand-picked by members of the group.  Although the change was not completed until mid-July 2012, Hand, Katz and their co-schemers backdated Greenway board resolutions to name a new President, CFO, Secretary, and director ("the new President") of Greenway as of June 20, 2012.  According to the new President's resume, his most recent

experience before coming to Greenway had been as a food and beverage manager and sommelier at a country club near where Katz and CS-2 lived.

19.     One of his first acts as the company's new President and sole director was to create the new control block of 150 million shares of restricted stock, issued in his own name as a trustee.  As set forth in the board resolutions, this new control block was issued by converting all five million outstanding shares of Greenway's Series A Preferred Stock.  However, because each share of Series A Preferred Stock only converted into 10 shares of common stock, the new President and sole director first issued a resolution changing the conversion ratio to 30 shares of common stock for each share of Series A Preferred.  Once the new control block had been created, Hand directed Greenway's transfer agent to send the stock certificate for 150 million restricted shares to him, and on August 8, 2012, the physical certificate was sent to Hand.

**C.     Hand and Katz, and Their Co-Schemers, Arrange for 15 Million Shares of Greenway Stock to be Fraudulently Designated as Unrestricted Shares**

20.      In order for their Greenway stock to be ready to sell after the planned misleading promotional campaign, Hand, Katz and their co-schemers maneuvered to have the stock fraudulently designated as "unrestricted," or, in their parlance, "free trade shares."  As of June 30, 2012, the vast majority of Greenway's stock – approximately 20,237,466 of 20,265,802 shares – was restricted and therefore unable to be sold in the public marketplace absent an exemption from the stock registration requirements imposed by the Securities and Exchange Commission.  Rule 144, issued under the Securities Act of 1933, provides the most commonly used exemption for selling restricted stock.  In order to use the Rule 144 exemption the company that processes the stock transaction, a transfer agent, generally requires a legal opinion letter stating that the conditions of Rule 144 have been met.  One of the conditions of Rule 144 is that

the company is not, and has never been, a shell company.  Greenway had existed as a shell

company for years and remained so in June 2012.  Another requirement in order to use the Rule

144 exemption is that the restricted stock must be held for at least a year after being acquired

from an issuer or an affiliate of an issuer before it can be sold into the market.

21.     Hand, Katz and their co-schemers had agreed to use 15 million purportedly "free

trade" shares of Greenway stock in their pump-and-dump scheme.  As of June 2012, however,

there were only 20,265,802 million shares of Greenway stock outstanding, and the restricted

status of about half of that stock (9,928,367 shares) could not be immediately changed as it was

controlled by the then president of Greenway whom the group was in the process of replacing.

This left the other block of 9,689,439 shares held in the names of the seven entities and three

individuals associated with Hand.

22.     In order to make up the difference and get their total to 15 million shares of stock,

Hand, Katz and their co-schemers arranged for seven million new shares of Greenway stock to

be created by installing the new President, presenting him with backdated documents and

causing the new President to issue board resolutions authorizing the issuance of seven million

new shares.  The backdated documents consisted of assignments to Florence Consulting, LLC

("Florence Consulting") and Lara Mac, Inc. ("Lara Mac") (entities controlled by Katz and CS-2)

of portions of the aforementioned $230,000 note to the JK Advisers Hedge Fund that Hand

controlled.   The assignments were generated in 2012, but were backdated to June 20, 2010,

presumably to satisfy the one-year holding period under Rule 144 so that shares could be issued

without restrictive legends.

23.     Hand, Katz and their co-schemers then arranged for Lara Mac and Florence

Consulting to send identical letters dated July 25, 2012, by which each relied on the backdated

assignments and converted $10,000 of the $230,000 note into 3,500,000 shares, respectively, of Greenway stock.

24.     As the seven million shares were being created, Hand and the affiliate entities he controlled transferred 6,023,089 shares of Greenway common stock to nominees designated and controlled by CS-1.   After transferring these shares, Hand remained in control of nearly four million shares of Greenway stock through two entities (Esthetics World and Sheridan Clearing Corp.) and two individuals with whom he was affiliated.  Hand subsequently took steps to deposit and clear at least two million of these shares for trading.

25.     None of these 15 million shares of Greenway stock could be used by the group in their intended pump-and-dump scheme if the stock could not be deposited into brokerage accounts and sold into the market.  Thus, the group took steps to ensure that the newly-issued 7 million shares were issued without restrictive legends and that the restrictive legends on the shares controlled by Hand and CS-1 were removed.

26.     Beginning in July 2012, Hand took several additional steps geared towards getting the transfer agent handling Greenway's stock to remove the restrictive designation, or legend, on the stock, so that it fraudulently could be freely traded in the OTC markets.   First, Hand prepared and caused Greenway to file an updated annual report with OTC Markets in July 2012 stating that "the company has never been a 'shell company.'"  That statement was false and Hand knew, or should have known, that it was false.  As with earlier filings, Hand filed a letter with the report, dated July 24, 2012, stating that he had been retained by Greenway as its disclosure counsel and that, in that capacity, he had examined the report and the company's accounting records and that he had spoken with management about the company and the report.

27.     Hand also signed and sent an opinion letter dated July 31, 2012 to the transfer agent for Greenway stock in which he opined that the 7 million shares (3.5 million shares each) issued to Lara Mac and Florence Consulting could be issued without restrictive legends pursuant to Rule 144.  This letter contained a number of fraudulent misstatements, including the false and misleading representations:  (1) that Lara Mac and Florence Consulting had acquired portions of an outstanding promissory note in 2010; (2) that Hand was unaware of any factors that would make Lara Mac or Florence Consulting affiliates; and (3) again, that Greenway had never been a shell company.  Along with this letter, Hand also sent one of the backdated note assignments and the two fraudulent conversion notices from CS-2 and one of Katz's associates to the transfer agent.  As a result of this opinion letter the 7 million shares issued to Lara Mac and Florence Consulting, entities controlled by Katz and CS-2, were deemed unrestricted, or free trading, and subsequently were sold by Hand, Katz and their co-schemers during the pump-and-dump scheme.

28.     Hand authored similarly false opinion letters to the brokerage firm handling transactions of the Greenway stock, directing the removal of restrictive legends from the two million shares issued to Esthetics World and one of the individuals with whom he was affiliated. Having received this letter, the brokerage firm accepted at least one million shares of Greenway stock for deposit.  Those now purportedly "unrestricted" shares subsequently were sold by Hand, Katz and their co-schemers during the pump-and-dump scheme.

29.     When the group encountered questions from other brokerage firms reluctant to clear their shares of Greenway stock for trading, Hand authored additional false opinion letters to address the brokers' concerns.  Hand also authored letters falsely representing the total number of unrestricted shares of Greenway stock in the marketplace.  All of these false opinion letters

authored by Hand or, in some instances, by an attorney associated with Hand, were designed to clear the way for Greenway stock to be sold, without restriction, in the OTC markets to unsuspecting investors.

> **D.  Hand and Katz, and Their Co-Schemers, Pump the Price of Greenway Stock with Fraudulent Promotional Campaigns, then Dump Stock They Own and/or Control in Sales to Unsuspecting Investors**

30.     By the end of August 2012, much of the groundwork for the scheme had been laid.  Hand, Katz and their co-schemers had agreed on how to divide the proceeds after they dumped their shares in the market, and Hand's wave of opinion letters had succeeded in fraudulently converting the Greenway stock the group owned or controlled from "restricted" to "unrestricted" status.  Greenway itself still had no operations, no assets, and, with the exception of the new President installed by the group, no employees.

31.     Ready to commence a promotional campaign, Hand, Katz and their co-schemers targeted Andalusian Resorts, LLC ("Andalusian"), a development stage company which planned to engage in the operation of a chain of resorts and spas catering to gay and lesbian clientele, for acquisition using Greenway stock.  The acquisition, which was not intended as a legitimate business transaction, would provide Hand, Katz and their co-schemers with the illusion of business activity by Greenway heading into the promotions.  On August 23, 2012, Katz and CS-1 received an e-mail with seven sample headlines for press releases that could be issued if Greenway acquired Andalusian, and on October 25, 2012, Greenway announced its acquisition of Andalusian in exchange for two million shares of preferred stock.

32.     In November 2012, Hand, Katz and their co-schemers launched a promotion to tout the Greenway's stock.  Between November 14 and 15, 2012, CS-2 wired a total of $160,000 to M. Elliott Media LLC, an entity controlled by CS-3.  The funds were to be used to hire

13

promoters to tout Greenway's stock, and CS-3 immediately wired $150,000 to a stock promoter

to start touting Greenway's stock on Monday, November 19, 2012.

33.     On November 18, 2012, the night before the touting campaign was to begin, Katz

e-mailed CS-3 with the text of a promotional alert for Greenway.  CS-3, in turn, forwarded the e-

mail to his cousin, directing him to send the e-mail alert from websites controlled by CS-3 and

his cousin and by CS-2.  On the morning of November 19, 2012, three websites they controlled

sent out e-mail alerts touting Greenway's stock.  The alerts provided a link to a press release

issued by Greenway on November 16, 2012, which falsely stated that Greenway had already

announced that "we are in final negotiations with hotels in Palm Springs, California and Las

Vegas, Nevada; we will soon be announcing our entry into the Orlando, Florida market. . . ."

After the trading day closed, the same websites sent an e-mail blast reporting on the stock's

"huge gains" and "even bigger volume[.]"

34.     That same morning, the stock promoter paid by CS-3 issued e-mail alerts from at

least two of the websites that he controlled.  A November 19, 2012 e-mail blast sent by the

promoter falsely stated that the company was in the process of completing an acquisition of

resort property in Las Vegas, Nevada.

35.     Minutes before trading started on November 19, CS-2 put in a limit order from his

Lara Mac account to sell 99,000 shares of Greenway stock at $.095 per share.  The order was

executed within seconds after the market opened, resulting in net proceeds of about $8,890.  A

few minutes later, at 9:40 a.m., CS-3 placed a market order to sell 3,381,000 shares of Greenway

stock.  Within seconds, this order was routed to a trader at a Florida firm ("the trader") for

execution.  Instead of purchasing 3,381,000 shares of Greenway stock at 9:40 a.m., the trader

waited until 11:12 a.m. to execute the order and in the meantime, the trader executed 124

separate short sales for a total of 3,376,754 shares of Greenway's stock at prices between $.097 and $.175 per share (as well as six purchases for a total of 56,000 shares).  The trader's 124 short sales for a total of 3,376,754 shares and the sale of CS-2's 3,381,000 shares all were fraudulently reported to the market as separate transactions, cumulatively adding 6,757,754 shares traded to the total volume of trades being reported to the investing public.

36.      The trading by CS-2 through the Florida firm was designed to artificially inflate the volume of trading reported in order to entice investors watching Greenway's stock on November 19, 2012 to make purchases.  CS-3 arranged to have the trader execute what he and CS-2 called "backfills" and "double prints," referring to the effect of structuring a trade so that multiple trades are reported to the market for what is effectively a single trade, with the result being that the volume of trading reported to the market is artificially inflated.

37.      The promotion continued on November 20 and 21, 2012, with Greenway releasing press releases each morning, accompanied by blast e-mail promotional alerts sent by the promoter hired by CS-3.  For example, a November 20, 2012 morning e-mail blast contained the following statements which were misleading insofar as they pointed to the overstated volume of trading in Greenway's stock as evidence of actual investor interest:  "GWYT traded about $2.7 million yesterday! . . . GWYT was one of the most popular companies in the ENTIRE market . . . GWYT was by far the most traded stock in the entire penny stock market…"  CS-3, who hired the promoter to tout the stock, knew that the November 19 trading by CS-2 and the trader was intended to artificially drive up Greenway's trading volume.

38.      The first promotion was a success for Hand, Katz and their co-schemers because it generated investor interest so that CS-2 and others were able to sell their stock to unsuspecting investors at artificially high prices.  CS-2 sold 3,480,000 shares of Greenway stock through his

Lara Mac account for net proceeds of about $405,748.  Another 80,000 shares were sold through

Florence Consulting's account (controlled by Katz and CS-2) for additional net proceeds of

about $9,656.  Meanwhile, CS-1 sold approximately 1,564,222 shares for net proceeds of

approximately $139,751, and Esthetics World (a Hand-related entity) sold 100,000 shares for net

proceeds of about $7,838.  In the month and a half preceding the promotion, the average daily

trading volume for the company's stock was about 60,003 shares, and the stock traded at a high

of $.13 and a low of $.05.  By contrast, between November 19 and 21, 2012, the average daily

trading volume for Greenway's stock was about 9,734,900 shares, and the stock traded at a high

of $.21 and a low of $.05.

39.     Hand, Katz and their co-schemers followed the first promotion with a second,

less-expensive touting campaign.  On December 7, 2012, CS-2 wired $40,000 to a different stock

promoter and on the evening of December 10, 2012, an e-mail blast went out promoting

Greenway's stock.  This was followed the next morning by a company press release and a

second promotional e-mail blast.  The promotional e-mail blast touted the "massive increase in

volume" that had been generated, not by genuine market factors, but by the prior fraudulent

promotion.

40.     The second promotion was also profitable for the group, although less profitable

than the first.  In total, the group sold approximately 1,908,838 shares of Greenway stock for

proceeds of about $55,747.  The second promotion resulted in a substantial increase in the

trading volume of Greenway's stock (5,186,000 shares traded on December 11, 2012 versus an

average daily trading volume of about 334,125 shares in the weeks preceding the promotion).

The company's stock price, however, only rose to a high of $.05, which was $.01 higher than the

closing price on December 10, 2012.

41.     In none of the materials used in the promotional campaigns for Greenway did Hand or Katz or their co-schemers disclose that funding for the promotion came from individuals who secretly owned and controlled millions of shares of Greenway stock and who intended to dump those shares into the OTC markets and sell them to unsuspecting investors in the wake of the promotional campaign.

42.     Combined, during the pump-and-dump activity, Hand, Katz, and their co-schemers sold more than twelve million net shares of Greenway stock between August 24, 2012 and January 23, 2013, causing losses to the investing public of approximately $855,586.

43.     During the period June 2012 through January 2013, no registration statement was filed with the Commission or was in effect as to Greenway's securities. During that same period, the defendants were underwriters as defined in 17 C.F.R. 230.144 ("SEC Rule 144") and no valid exemptions or safe harbors applied to the offers to sell or to the offers to buy Greenway stock by Hand, Katz and their co-schemers.

44.     The stock sales by Hand, Katz and their co-schemers also were subject to sales and volume limits imposed by SEC Rule 144 because the defendants were "affiliates" of Greenway.  An "affiliate" of an issuer (here, Greenway) is a person that directly, or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer.  The defendants controlled Greenway through companies and individuals they controlled, as well as their co-schemers, and because of their significant ownership of Greenway stock.  SEC Rule 144 limits the volume of securities legally able to be sold for the account of an "affiliate" of an issuer to the greater of one percent of the shares or other units of the class of outstanding stock as shown by the most recent report or statement published by the issuer, or the

average weekly reported volume of trading in such securities. The stock sales by Hand, Katz and their co-schemers as part of the pump-and-dump far exceeded that limit.

## FIRST CLAIM FOR RELIEF

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5, thereunder**

**(As to Defendant Jehu Hand)**

45.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 44 above as if set forth fully herein.

46.     From at least June 2012 through January 2013, defendant Jehu Hand, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly, willfully and recklessly a) employed devices, schemes and artifices to defraud, b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and c) engaged in acts, practices, and courses of business which operated and which would operate as a fraud or deceit upon certain persons.

47.     By reason of the foregoing, defendant Jehu Hand, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c), thereunder**

**(As to Defendant Antonio Katz)**

48.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 44 above as if set forth fully herein.

49.     From at least June 2012 through January 2013, defendant Antonio Katz, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly, willfully and recklessly a) employed devices, schemes and artifices to defraud, and b) engaged in acts, practices, and courses of business which operated and which would operate as a fraud or deceit upon certain persons.

50.     By reason of the foregoing, defendant Antonio Katz, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c), thereunder, 17 C.F.R. § 240.10b-5(a) and (c).

### THIRD CLAIM FOR RELIEF

### Violation of Section 17(a) of the Securities Act

### (As to Defendant Jehu Hand)

51.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 44 above as if set forth fully herein.

52.     Defendant Jehu Hand, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities a) employed devices, schemes and artifices to defraud, b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and c) engaged in acts, practices, and courses of business which operated and which would operate as a fraud or deceit upon certain persons.

53.     By engaging in the conduct described above, defendant Jehu Hand, singly or in

concert, directly or indirectly, have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## FOURTH CLAIM FOR RELIEF

### Violation of Section 17(a)(1) and (3) of the Securities Act

### (As to Defendant Antonio Katz)

54.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 44 above as if set forth fully herein.

55.     Defendant Antonio Katz, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities a) employed devices, schemes and artifices to defraud, and b) engaged in acts, practices, and courses of business which operated and which would operate as a fraud or deceit upon certain persons.

56.     By engaging in the conduct described above, defendant Antonio Katz, singly or in concert, directly or indirectly, have violated, and unless enjoined will continue to violate, Section 17(a)(1) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(1) and (3).

## FIFTH CLAIM FOR RELIEF

### Violations of Section 5(a) and Section 5(c) of the Securities Act

### (As to Both Defendants)

57.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 44 above as if set forth fully herein.

58.     From at least June 2012 through January 2013, defendants Jehu Hand and Antonio Katz directly or indirectly, as to Greenway securities: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell

securities through the use or medium of a prospectus or otherwise; or carried securities or caused such securities to be carried through the mails or in interstate commerce, by means or instruments of transportation, for the purpose of sale or delivery after sale; and (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to offer to buy, through the use or medium of any prospectus or otherwise, securities without a registration statement having been filed with the Commission or being in effect as to such securities.

59.     The defendants were underwriters as defined in 17 C.F.R. 230.144 ("SEC Rule 144").

60.     No valid exemptions or safe harbors apply to defendants' offer to sell or offer to buy Greenway stock.

61.     Neither Greenway nor its securities were registered with the Commission at the time of the Greenway scheme, nor was any registration of Greenway stock in effect at that time.

62.     By reason of the foregoing, the defendants, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## SIXTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 5(a) and Section 5(c) of the Securities Act**

**(As to Defendant Jehu Hand)**

63.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 44 above as if set forth fully herein.

64.     From at least June 2012 through January 2013, defendant Antonio Katz and CS-2, directly or indirectly, as to Greenway securities: (a) made use of the means or instruments of

transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise; or carried securities or caused such securities to be carried through the mails or in interstate commerce, by means or instruments of transportation, for the purpose of sale or delivery after sale; and (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to offer to buy, through the use or medium of any prospectus or otherwise, securities without a registration statement having been filed with the Commission or being in effect as to such securities.

65.     Defendant Katz and CS-2 were underwriters as defined in 17 C.F.R. 230.144 ("SEC Rule 144").

66.     No valid exemptions or safe harbors apply to any offer to sell or offer to buy Greenway stock by defendant Katz and CS-2.

67.     Defendant Katz and CS-2 thereby violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

68.     Defendant Hand aided and abetted the violations of Sections 5(a) and 5(c) of the Securities Act by defendant Katz and CS-2 by, among other things, a) acting as legal counsel for Greenway and using one or more backdated debt assignments, or convertible promissory notes, to justify the issuance of millions of unrestricted shares of Greenway stock to entities and individuals under the control of the defendants and the co-schemers; b) acting as legal counsel for Greenway and writing and sending false legal opinion letters to firms that did business with Greenway to facilitate the issuance, depositing and, ultimately, sale of the Greenway stock controlled by the defendants and the co-schemers; and c) providing substantial assistance in secretly planning and orchestrating the sale of Greenway stock to the public at artificially

inflated prices and without proper registration statements in effect.

69.     By reason of the foregoing, defendant Hand aided and abetted Katz's and CS-2's violations of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment that:

### I.

Permanently enjoins defendants Jehu Hand and Antonio Katz, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

### II.

Permanently enjoins defendants Jehu Hand and Antonio Katz , their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

### III.

Permanently enjoins defendants Jehu Hand and Antonio Katz , their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 5 of the Securities Act, 15 U.S.C. § 77q.

### IV.

Orders defendants Jehu Hand and Antonio Katz to pay civil money penalties pursuant to

Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## V.

Orders and requires defendants Jehu Hand and Antonio Katz to disgorge their ill-gotten gains and losses avoided, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court.

## VI.

Issues an Order barring defendants Jehu Hand and Antonio Katz from participating in any offering of penny stock, pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## VII.

Retains jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered.

## VIII.

Grants such other and further relief as the Court may deem just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Dated:   Boston, Massachusetts
              December 10, 2015

On behalf of the Commission,

_____//s// Martin F. Healey_____
Martin F. Healey (MA BBO No. 227550)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
(617) 573-8952 (Healey)
HealeyM@sec.gov